UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MILTON A. HARRIS,

        Petitioner,

                                       CASE NO. 05-CV-70580-DT

   v.                                  JUDGE NANCY G. EDMUNDS
                                         MAGISTRATE JUDGE PAUL J. KOMIVES

RAYMOND BOOKER,

        Respondent.

_____/


## **REPORT AND RECOMMENDATION**

*Table of Contents*

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . 4
     C.    *Exhaustion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
     D.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     E.    *Trial Court's Findings of Fact and the Sufficiency of the Evidence (Claim I)* . . . . . . . . . . . . . . . 8
          1.    *The Trial Court's Findings* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
          2.    *Michigan Homicide Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
          3.    *Whether the Findings Required a Verdict of Guilty on Voluntary Manslaughter* . . . . . 14
          4.    *Sufficiency of the Evidence* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
               a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
               b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
     F.    *Failure to Produce Res Gestae Witness (Claims II & III)* . . . . . . . . . . . . . . . . . . . . . . . . 20
          1.    *The State Court Proceedings* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
               a. Compliance with the Res Gestae Statute . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
               b. Denial of Continuance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
     G.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

I.      RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus.

II.     REPORT:

A.      *Procedural History*

1.      Petitioner Milton A. Harris is a state prisoner, currently confined at the Ryan Correctional Facility in Detroit, Michigan.

2.      On August 17, 2000, petitioner was convicted of one count of second degree murder, MICH. COMP. LAWS § 750.317; and one count of possessing a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a bench trial in the Wayne County Circuit Court. On September 12, 2000, he was sentenced to a term of 20-40 years' imprisonment on the murder conviction, and to a mandatory consecutive term of two years' imprisonment on the felony-firearm conviction.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.      APPLICATION OF THE CORRECT STANDARDS OF LAW TO THE FACTS FOUND BY THE TRIAL JUDGE REQUIRE THE REDUCTION OF THE CONVICTION TO MANSLAUGHTER.

        A.      THE "MALICE" REQUIRED FOR A MURDER CONVICTION IS HERE NEGATED BY FACTS AND CIRCUMSTANCES WHICH MITIGATE THE OFFENSE TO VOLUNTARY MANSLAUGHTER.

        B.      THE TRIAL COURT'S SPECIFIC FINDING REGARDING DEFENDANT'S INTENT TO CREATE A HIGH RISK OF HARM DOES NOT HERE ESTABLISH "DEPRAVED-HEART" MALICE.

II.     THE TRIAL COURT CLEARLY ERRED IN FINDING THAT THE PROSECUTION HAD EXERCISED "DUE DILIGENCE" TO PRODUCE AN ENDORSED WITNESS.

2

III.   THE COURT ABUSED ITS DISCRETION IN DENYING THE DEFENDANT'S REQUEST FOR AN ADJOURNMENT TO PRODUCE THE RES GESTAE WITNESS.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Harris*, No. 231398, 2002 WL 1424839 (Mich. Ct. App. June 28, 2002) (per curiam) ("*Harris I*"). Judge Meter dissented in part, concluding that the case should be remanded to the trial court for additional findings with respect to the manslaughter issue.

4.     Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan Supreme Court.  In lieu of granting leave to appeal, the Supreme Court vacated the court of appeals's decision and remanded the case with instructions that the court of appeals remand the case to the trial court for additional findings regarding petitioner's intent, in accordance with Judge Meter's dissent in the court of appeals.  *See People v. Harris*, 468 Mich. 879, 659 N.W.2d 240 (2003) ("*Harris II*").

5.     On remand, the trial court determined that defendant acted with the requisite malice aforethought necessary to support a conviction for second degree murder.  The trial court explained that it's "erroneous and unfortunate use of the phrase 'that this was shooting which came from hot blood', was in no way intended to mean that it meets the test for voluntary manslaughter." *People v. Harris*, No. 99-010817, at 2 (Wayne County, Mich., Cir. Ct. June 24, 2003) ("*Harris III*").

6.     Following the trial court's order the Michigan Court of Appeals, which had retained jurisdiction, issued an opinion affirming petitioner's conviction for second degree murder.  The court concluded that petitioner's conviction was fully supported by the record, and the trial court in its original opinion had "merely worded its findings inartfully and fully concluded that all the necessary elements of second-degree murder were established." *People v. Harris*, No. 231398, 2003 WL

3

21771746, at *1, slip op. at 2 (Mich. Ct. App. July 31, 2003) (quotation omitted) ("*Harris IV*").

7.     Petitioner, proceeding *pro se*, sought leave to appeal this decision to the Michigan Supreme Court, raising the following claim:

> DOES THE APPLICATION OF THE CORRECT STANDARD OF LAW TO THE FACTS FOUND BY THE TRIAL COURT REQUIRE REDUCTION OF THE CONVICTION TO MANSLAUGHTER AFTER REMAND AND THE TRIAL COURT'S STATEMENT THAT "HOT BLOOD" WAS ERRONEOUS[LY] USED?

The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Harris*, 469 Mich. 989, 674 N.W.2d 155 (2003).

8.     Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on February 14, 2005.  As grounds for the writ of habeas corpus, he raises the claims that he raised in the state courts.

9.     Respondent filed his answer on September 9, 2005.  He contends that petitioner's claims are not cognizable because they are based solely on state law.  Respondent also contends that, to the extent that petitioner does raise federal constitutional claims, the claims are not exhausted because they were not raised as federal constitutional claims in the state courts.  Alternatively, respondent contends that petitioner's claims are without merit.

10.     Petitioner filed a reply to respondent's answer on September 23, 2005.

B.     *Factual Background Underlying Petitioner's Conviction*

The factual background underlying petitioner's conviction was summarized by the Michigan Court of Appeals:

> Defendant's convictions arose out of the shooting death of Sammy Wright in Detroit on the evening of July 17, 1999.  During the bench trial, Wright's sister-in-law, Anita Thomas, testified that on that evening, she saw defendant shoot a long gun at the apartment house she shared with Wright.  Soon afterwards, she found Wright lying on the porch of the house, bleeding.  Boguslaw Pietak, M.D., the assistant

4

medical examiner for Wayne County, testified that Wright's body was covered with over twenty puncture wounds, likely caused by pellets from a shotgun. Further, he determined the cause of death to be a single shotgun blast. Pietak also testified that according to Wright's blood-alcohol content, he had been intoxicated at the time of his death.

City of Detroit Police Officer John Morell testified that he interviewed defendant on October 13, 1999. According to Morell, defendant gave the following details about the shooting after being advised of his *Miranda* rights. Defendant did not know Wright. On the night in question, defendant happened to walk past Wright's house, and Wright pointed a handgun at him, saying "I'm going to kill me a bitch ass –---- tonight." Defendant then went home and walked past Wright's house again "two or three hours later," at which point Wright came out to the porch and said, "There's that bit ass –---- now." Defendant then ran back to his house, retrieved his shotgun, and returned to Wright's house, yelling, "F--- that. You're not going to pull a gun on me again." According to defendant's own statement, an unnamed individual put his arm around him and attempted to persuade him to stop, but defendant rebuked this attempt. After Wright said, "I'm going on [sic] kill you," defendant discharged his shotgun. Then, because he perceived that Wright was coming after him, defendant shot again. Defendant was drunk, but not "falling down drunk," during the shooting. After the shooting, defendant placed the shotgun in a garbage can, called his cousin, and later played basketball with a friend.

At trial, defendant did not present any evidence, and did not testify on his own behalf. In closing arguments the prosecutor asserted that defendant's actions were premeditated and deliberate, and that defendant committed first-degree murder. In response, defense counsel contended that the record evidence did not indicate that defendant possessed the specific intent to kill, and that his actions on the evening of the killing were not premeditated and deliberate. Notably, defense counsel focused his arguments entirely on the elements of first- and second-degree murder, and he did not argue that the record evidence supported a conviction of either voluntary or involuntary manslaughter. Although the information charged defendant with the offense of first-degree premeditated murder, M.C.L. § 750.316(1)(a), the trial court convicted defendant of the lesser-included charge of second-degree murder, as well as felony-firearm.

*Harris I*, 2002 WL 1424839, at *1, slip op. at 1-2 (footnotes omitted).

C.    *Exhaustion*

Respondent contends that petitioner's claims are not exhausted because they were not presented as federal constitutional claims in the state courts. Even assuming that the claims are unexhausted, the Court should nevertheless reach the merits of the claims. A petitioner's failure to

exhaust state remedies does not deprive the court of its jurisdiction to consider the merits of the habeas petition. *See Granberry v. Greer*, 481 U.S. 129, 131 (1987). A federal court may decide a habeas petition on the merits when the grounds for relief are without merit or are not cognizable on habeas review. *See Cain v. Redman*, 947 F.2d 817, 820 (6th Cir. 1991); *Prather v. Rees*, 822 F.2d 1418, 1421-1422 (6th Cir. 1987); 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure to exhaust the remedies available in the court of the State."). In these circumstances, the court should dismiss the non-federal or frivolous claim on its merits to save the state courts the useless review of meritless constitutional claims. *See Cain*, 947 F.2d at 820. Because, as discussed below, petitioner is not entitled to relief on any of his claims, the Court should dismiss the claims on the merits rather than require further review in the state courts.

D.     *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

6

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court."  Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."  *Williams*, 529 U.S. at 412.  Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing

legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

E.    *Trial Court's Findings of Fact and the Sufficiency of the Evidence (Claim I)*

Petitioner first challenges his second degree murder conviction. He argues that the trial court's initial findings of fact established only the elements of manslaughter, not second degree murder. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.    *The Trial Court's Findings*

At the conclusion of the trial, the trial court made findings of fact and conclusions of law, finding defendant guilty of second degree murder. The court concluded that there was no question that the victim had died as a result of a shotgun blast, and that petitioner had shot the victim. *See* Trial Tr., Vol. II, at 112-13. The court then discussed at length the primary issue in the case,

8

petitioner's state of mind, concluding that the evidence of petitioner's state of mind supported only

a finding of second degree, as opposed to first degree, murder:

> The only issue really is that of intent because for first-degree murder the death must be, the defendant must have actually intended to kill the victim. He had to consider the pros and cons of killing and thought about it and chose his actions before he did it and there has to be real and substantial reflection for long enough to give a reasonable person [time] to think twice bout the intent to kill.
>
> Now, in this case there was time and Mr. Wagner did point that out. The defendant was home, or he was in a position of safety, he could have stayed there. If he felt he had been treated badly or dissed, in today's language, he could have chose [sic] to ignore it. If he felt he had been threatened, he could have called the police, he could have taken any one of a number of actions but, nonetheless, the fact that he had time to think about it does not necessarily mean that it was premeditated because it also has to mean that he had an actual intent to kill.
>
> From the testimony that I heard, it seems to me that *his anger was such that it is not clear what his intent was*. He clearly was angry from the language I quoted and he says in his own statement that he was yelling and that, when a guy he knew from the block told him to leave it alone, he shot and then shot again. Even after the guy said something, assuming that is correct that the guy started yelling at him, he shot again. So he did all of this while someone was pulling on him and trying to turn him around.
>
> And it seems to me that, when I take into account his own statement, plus the testimony indicating that he might not have been able to even know exactly who the – he knew that it was the guy, but he didn't even know the guy's name and that he might not even have known that that was the person on the porch or been able to see whether he was armed or not. He had been drinking.
>
> It just strikes me that there is nothing here that says that this gentleman went back to kill this person and I think, although I would agree that the fact that there's four shots doesn't mean he didn't intend to kill him. On the other hand, it doesn't necessarily mean that he did. I think the one shot, according to Ms. Thomas, was up in the air and, according to the defendant, was up in the air.
>
> So it seems to me that *he was so angry he was shooting at the house* and, when the guy came out, he shot at him too.
>
> So I just don't believe that I can find here that his actual intent was to kill. It seems to me his intent was to do great harm and *he was so angry that he really almost didn't know what he was doing*. He had been drinking which would feed into that anger and that he was going to shoot, as Mr. Wagner pointed out, whoever came out on that porch. He was going to keep shooting at the porch at the house.
>
> So I think he knowingly created a very high risk of death or great bodily harm knowing that death could result from his actions and certainly his actions were not justified and the excuse that the guy was going to, was yelling at him even after he fired the first shot, was not enough to justify the second shot.

So this certainly is not a case where the killing was justified or excused but, on the other hand, I think it's really, as Mr. Gordon said, one of the words we used to hear is *hot blood and I think this was a shooting which came from hot blood*.

The defendant didn't calculate this. He was *just so angry*, he went home, got his shotgun, went back and started shooting and, when the guy came out, he shot him and I think that's all part of, goes to the inability to have – let me put it in the correct way.

I think all of that goes to show that there is nothing here that says that he specifically intended to kill Mr. Wright.

So, therefore, I am finding the defendant guilty of murder in the second degree[.]

Trial Tr., Vol. II, at 113-16 (emphasis added).

On appeal petitioner, relying primarily on the emphasized language above, contended that the trial court's findings supported only a finding of guilt on the lesser charge of voluntary manslaughter. Petitioner raised two arguments in support of this claim. First, he contended, the trial court's factual findings regarding his anger, and specifically his acting in "hot blood," compelled the conclusion that the trial court had found the facts sufficient to mitigate the killing to voluntary manslaughter. Second, he contended that the trial court's findings regarding his intent–*i.e.*, that he created a high risk that death or great bodily harm *could* result–was insufficient to find the malice necessary to sustain a second degree murder conviction. At most, petitioner contended, this finding of his mental state would support only an involuntary manslaughter conviction. The Michigan Court of Appeals rejected each of these claims.

First, the court rejected petitioner's claim that the trial court had found the requisite provocation to mitigate the killing to voluntary manslaughter. The court of appeals reasoned that the trial court's use of the "hot blood" language did not amount to a finding of voluntary manslaughter because the trial court "carefully clarif[ied]" its conclusion by relating the anger and "hot blood" language the court had used to petitioner's specific intent to kill. *See Harris I*, 2002 WL

10

1424839, at *4, slip op. at 4-5.  The court explained that "a careful and thorough review of the record, viewed against the backdrop of the contested issues at trial, indicates that the trial court's somewhat inartful reference to 'hot blood' conveyed its finding that defendant (1) did not have the specific intent to kill Wright, and (2) did not act with premeditation and deliberation to support a conviction of first-degree murder."  *Id.*, slip op. at 5.

With respect to petitioner's second claim, the court of appeals noted that petitioner was correct in arguing that, to sustain a finding of malice sufficient to support second degree murder, petitioner must have intended to create a high risk of death or great bodily harm with knowledge that such is the *probable result*, and not merely with knowledge that death or great bodily harm *could* result.  *See id.* at *5, slip op. at 5.  Nevertheless, the court of appeals rejected petitioner's claim for two reasons.  First, the court noted that "the trial court also stated that defendant's 'intent was to do great harm,' a finding that in itself supported a second-degree murder conviction."  *Id.*  Second, the court reasoned that "it appears from a contextual review that the court's use of the word 'could' was inadvertent and that the court meant to indicate the existence of a mental state in accordance with the . . . 'probable result' standard."  *Id.*

Judge Meter dissented in part from the court's holding, although he did not agree with petitioner that he was entitled to relief.  Rather, Judge Meter noted that the trial court's language suggested that the court may have in fact made a factual finding of adequate provocation such that only a voluntary manslaughter conviction would be appropriate.  Based on the state of the record, Judge Meter concluded:

> While it is likely that the trial court merely worded its findings inartfully and fully concluded that all the necessary elements of second-degree murder were established, I, unlike the majority, cannot be certain of this conclusion based on the existing record.  I would direct the court on remand to indicate whether it unintentionally

11

> failed to consider a conviction for voluntary manslaughter or whether it considered such a conviction and rejected it.  If the court failed to consider a conviction for voluntary manslaughter, I would direct it to do so on remand and make the appropriate findings.

*Id*. at *8, slip op. at 3 (Meter, J., concurring in part and dissenting in part).

The Michigan Supreme Court, in lieu of granting petitioner's application for leave to appeal, vacated the court of appeals's decision and remanded the matter so that the trial court could issue further findings regarding petitioner's intent, in accordance with Judge Meter's dissent.  *See Harris II*, 468 Mich. at 879, 659 N.W.2d at 240.  On remand, the trial court clarified its findings regarding petitioner's intent and his guilt of second degree murder.  Specifically, after recounting the trial testimony, the court found:

> While the defendant was angry about having been called names and possibly seeing a gun drawn, it is clear that defendant knew exactly what he was doing when he changed his mind after telling his girl to "close and lock the door".  He got his shotgun, walked back to [t]he Wright house and, when Wright came out and yelled at him, shot two or more times at the house.
> By his own statement defendant knew that Wright was at the door or on the porch when he shot.  Thus, defendant knew that death or a great bodily harm would be the likely result.
> Even if Wright was yelling at defendant that he would "kill him", and even though Wright had produced a gun two or three hours earlier, [that] is not enough to justify or excuse defendant's action in shooting at the house.
> The fact that defendant was angry after the two encounters does not mitigate the effect of his action in shooting at the house when he knew Wright was there.  The oral disagreement and alleged threat, do not constitute adequate provocation.

*Harris III*, slip op. at 2.  The trial court therefore concluded that petitioner was guilty of second degree murder, not voluntary manslaughter.  The court further explained that its "erroneous and unfortunate use of the phrase 'that this was shooting which came from hot blood', was in no way intended to mean that it meets the test for voluntary manslaughter."  *Id*.  On appeal from this decision, the Michigan Court of Appeals affirmed petitioner's conviction, noting that the trial court

had specifically found that there was not adequate provocation to reduce the crime from second degree murder to manslaughter, and that this conclusion was fully supported by the record. *See Harris IV*, 2003 WL 21771746, at *1, slip op. at 1-2.

Petitioner presents the same arguments here that he presented to the state courts. Although not broken down thusly by petitioner, his claims raise two separate questions: First, whether the trial court's initial findings required entry of a verdict of guilty of voluntary manslaughter; and, second, whether sufficient evidence supports his conviction for second degree murder. Before analyzing these questions, however, it is useful to set forth the various elements of Michigan homicide law.

2.    *Michigan Homicide Law*

Under Michigan law, the common law crime of murder is defined as second degree murder, and is punishable by up to life imprisonment. *See* MICH. COMP. LAWS § 750.317. To establish second degree murder, the prosecution must show that the defendant killed a human being with malice aforethought. In order to show malice aforethought, the prosecution must establish one of three mental states on the part of the defendant at the time of the killing: (1) intent to kill; (2) intent to commit great bodily harm; or (3) intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result. *See People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984); *People v. Aaron*, 409 Mich. 672, 713-14, 299 N.W.2d 304, 319-20 (1980).

Under Michigan law, "[f]irst-degree murder is second-degree murder plus an added element[.]" *People v. Johnson*, 105 Mich. App. 498, 502, 307 N.W.2d 357, 359 (1981), *rev'd on other grounds*, 414 Mich. 899, 323 N.W.2d 5 (1982). Specifically, first degree murder is a second degree murder which also is committed: (a) during the commission of an enumerated felony; (b)

13

with premeditation and deliberation; (c) by means of poison or lying in wait; or (d) against a peace

or corrections officer during the course of his employment.  *See* MICH. COMP. LAWS § 750.316.

Conversely, under Michigan law "[m]anslaughter is murder without malice."  *People v.*

*Mendoza*, 468 Mich. 527, 534, 664 N.W.2d 685, 689 (2003).  "Murder and manslaughter are both

homicides and share the element of being intentional killings.  However, the element of provocation

. . . characterizes the offense of manslaughter [and] separates it from murder."  *People v. Pouncey*,

437 Mich. 382, 388, 471 N.W.2d 346, 350 (1991).  Thus, "[u]nder Michigan law, 'voluntary

manslaughter is an intentional killing committed under the influence of passion or hot blood

produced by adequate provocation, and before a reasonable time has passed for the blood to cool

and reason to resume its habitual control.'"  *Todd v. Stegal*, 40 Fed. Appx. 25, 29 (6th Cir. 2002)

(quoting *People v. Fortson*, 202 Mich. App. 13, 19, 507 N.W.2d 763, 767 (1993)).  In other words,

"to show voluntary manslaughter, one must show that the defendant killed in the heat of passion,

the passion was caused by adequate provocation, and there was not a lapse of time during which a

reasonable person could control his passions."  *Mendoza*, 468 Mich. at 535-36, 664 N.W.2d at 690.

Not every form of provocation, however, will suffice to negate the malice necessary for

murder.  As the Michigan Supreme Court has explained,

> [t]he provocation necessary to mitigate a homicide from murder to manslaughter is
> that which causes the defendant to act out of passion rather than reason. . . .
> In addition, the provocation must be adequate, namely, that which would
> cause the reasonable person to lose control.  Not every hot-tempered individual who
> flies into a rage at the slightest insult can claim manslaughter.  The law cannot
> countenance the loss of self-control; rather, it must encourage people to control their
> passions.

*Pouncey*, 437 Mich. at 389, 471 N.W.2d at 350; *see also*, *People v. Sullivan*, 231 Mich. App. 510,

518, 586 N.W.2d 578, 582 (1998).

14

3.      *Whether the Findings Required a Verdict of Guilty on Voluntary Manslaughter*

The crux of petitioner's argument is that the trial court's initial findings, at the conclusion of his bench trial, required the entry of a verdict of guilty on the lesser charge of voluntary manslaughter.  He also argues that the trial court's findings with respect to his intent were insufficient to establish the malice element of his second degree murder conviction.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

Whether the trial court's initial findings were sufficient to sustain his conviction of second degree murder is a question of state law, not cognizable on habeas review.  Importantly, the trial court never made a specific factual finding that petitioner had acted under the provocation necessary to sustain a conviction for voluntary manslaughter.  On the contrary, the trial court's discussion focused on whether petitioner specifically intended to kill as an element of first degree murder, rather than on whether he acted under adequate provocation.  While the trial court did use language suggestive of voluntary manslaughter–*i.e.*, "hot blood"–this alone does not amount to a finding that adequate provocation was established as a legal matter.  As another Judge of this Court has observed in a similar context, "[t]here is no federal constitutional requirement that, in a criminal case charging more than one offense, every statement of the trial judge must be consistent with each of the verdicts rendered."  *Baran v. Trippett*, No. 98-CV-74255, 2000 WL 1481028, at *7 (E.D. Mich. Sept. 5, 2000) (Duggan, J.) (citing *Harris v. Rivera*, 454 U.S. 339 (1981)).

More importantly, however, the trial court's supplemental findings removed all doubt as to the court's verdict.  The trial judge explicitly stated that her earlier use of words such as "hot blood" was mere inartful phrasing, and that she never intended to suggest that petitioner was guilty of voluntary manslaughter.  On the contrary, the judge explained, petitioner was clearly guilty of

15

second degree murder, and clearly did not act under adequate provocation as defined by Michigan law. This clarification leaves no doubt that the trial court found petitioner guilty of second degree murder.

Thus, the only way in which petitioner can succeed on this claim is by showing that the trial court's supplemental findings are not valid. This he cannot do. The only constitutional basis for challenging the second findings is the Double Jeopardy Clause of the Fifth Amendment. This provision is not implicated here, however. It is true that "[a] verdict of acquittal on the issue of guilt or innocence is, of course, absolutely final[,]" *Bullington v. Missouri*, 451 U.S. 430, 445 (1981), and thus an "acquittal, however erroneous, bars further prosecution on any aspect of the count and hence bars appellate review of the trial court's error." *Sanabria v. United States*, 437 U.S. 54, 69 (1978); *see also*, *Ball v. United States*, 163 U.S. 662, 670 (1896). Here, however, the trial court's initial findings of fact and conclusions of law did not amount to an acquittal on the second degree murder charge. For purposes of the Double Jeopardy Clause, an "acquittal" will be found "only when it is plain that [the trial court] . . . evaluated the Government's evidence and determined that it was legally insufficient to sustain a conviction." *United States v. Scott*, 437 U.S. 82, 97 (1978) (internal quotations omitted); *see also*, *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977) (to determine whether trial court's action constitutes an acquittal reviewing court must determined whether the ruling "actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged.").

Here, the trial court's initial findings did not amount to an evaluation of the government's evidence and a conclusion that the evidence was insufficient to sustain a second degree murder conviction. *See People v. McDonald*, 748 N.E.2d 255, 259 (Ill. Ct. App. 2001) ("[W]e decline to

16

infer from this confused verdict, in the face of the trial court's silence on the matter, any *actual* finding that McDonald was innocent of armed robbery.")  At most, the trial court's "hot blood" language was ambiguous with respect to what the trial court had actually found.  For purposes of the double jeopardy analysis, it was an issue for the state courts to determine the meaning of this ambiguous ruling, and this Court is bound by the state courts' interpretations.  *See Tibbs v. Florida*, 457 U.S. 31, 47 & n.24 (1982); *Greene v. Massey*, 437 U.S. 19, 26-27 (1978); *Rivera v. Sheriff of Cook County*, 162 F.3d 486, 489 (7th Cir. 1998); *Scott v. Jones*, 862 F.2d 1311, 1315-16 (8th Cir. 1988).  Nothing in the Double Jeopardy Clause prevented the Michigan Court of Appeals from remanding for additional statements from the trial judge clarifying her decision.  "Where a new entry was made on the basis of evidence already in the record, there is neither a constitutional right to be present when that formal entry is made by the state trial judge nor is the double jeopardy clause violated, the practice of appellate courts in remanding cases for more explicit findings is commonplace in both criminal and civil appeals." *Schiro v. Clark*, 754 F. Supp. 646, 651 (N.D. Ind. 1990); *see also*, *United States v. Cosentino*, 869 F.2d 301, 309 (7th Cir. 1989); *State v. Alvarez*, 904 P.2d 754, 764 (Wash. 1995).

In short, the trial court's initial findings were adequate to sustain a second degree murder conviction and, even if inadequate, they did not amount to an acquittal such that the trial court's supplemental findings violated petitioner's double jeopardy rights.[1]  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

4.    *Sufficiency of the Evidence*

---

[1]Although the above discussion focuses on the manslaughter issue, the analysis is equally applicable to petitioner's claim that the trial court did not find that he had the intent necessary to sustain a second degree murder conviction.

17

Implicit in petitioner's first claim is the subsidiary claim that the evidence was insufficient to support his conviction for second degree murder.  He contends that the evidence shows, at most, that he is guilty of voluntary manslaughter.  The Court should reject this claim.

### a.  Clearly Established Law

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970).  Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution.  *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992).  In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence.  *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993).  However, under the amended version of § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision.  Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, "[t]he applicability

18

of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

### b. Analysis

Here, there was sufficient evidence to establish each of the elements of second degree murder beyond a reasonable doubt. There was no question that petitioner had killed Wright, and thus the only issue was petitioner's intent. The evidence at trial showed that petitioner armed himself with a gun, returned to the house where Wright was staying, and intentionally fired his shotgun multiple times at the porch, knowing that Wright was on the porch. This evidence was sufficient to show beyond a reasonable doubt that petitioner, at a minimum, acted with the intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm was the probable result–*i.e.*, with malice aforethought. *See Jackson v. Withrow*, No. 99-74892, 2002 WL 482551, at *5 (E.D. Mich. Feb. 28, 2002) (Cohn, J.); *People v. Abraham*, 256 Mich. App. 265, 270, 662 N.W.2d 836, 841 (2003); *People v. Williams*, No. 234936, 2002 WL 31930868, at *1 (Mich. Ct. App. Nov. 15, 2002) (per curiam).

Likewise, there was sufficient evidence to establish beyond a reasonable doubt that petitioner did not act under sufficient provocation to lessen the homicide the manslaughter. The undisputed evidence showed that, after the initial confrontation with Wright, petitioner returned to the home of his girlfriend, where he stayed for some time. Only after a lapse of time sufficient for his passions to cool did petitioner arm himself with a shotgun and return to Wright's home. This evidence

19

negates any finding of voluntary manslaughter.  *See Todd*, 40 Fed. Appx. at 29; *Draughn v. Jabe*, 803 F. Supp. 70, 76 (E.D. Mich. 1992) (Gadola, J.), *aff'd*, 989 F.2d 499 (6th Cir. 1993) (unpublished); *Pouncey*, 437 Mich. at 392, 471 N.W.2d at 351 ("After a few insults were exchanged, the defendant went into the house, a safe harbor.  There was no evidence that the defendant was compelled to go back outside by anyone. . . .  Instead, the defendant chose to retrieve the shotgun from the closet in the back of the house and chose to go back outside.").  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.    *Failure to Produce Res Gestae Witness (Claims II & III)*

Petitioner next challenges that prosecutor's failure to produce a res gestae witness, Bobby Dushan Smith, and the trial court's failure to grant a continuance to secure, in particular, Smith's presence at trial.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.    *The State Court Proceedings*

At trial, the prosecutor indicated that he could not produce three witnesses at trial, all of whom had been listed as res gestae witnesses by the prosecutor: Smith, Jerome Williams, and Brian Haynes.  Petitioner declined to waive their appearances, and the trial court conducted a due diligence hearing.  *See* Trial Tr., Vol. II, at 80-83.  At the hearing, Sergeant Vozell Jennings, the officer in charge of the case, testified as to the police efforts to locate the witnesses and secure their attendance.  With respect to Bobby Smith, Sgt. Jennings testified that the police had served a material witness detainer on Smith at the home of his girlfriend prior to the trial.  On the morning of the first day of trial, two officers picked up Smith, drove him to the courthouse, and dropped him off in front of the building.  Smith, however, did not appear in the courtroom.  Sgt. Jennings then

sent officers to look for Smith at the home of his girlfriend, but they were unable to locate Smith. *See id.* at 84-91.

With respect to Jerome Williams, Sgt. Jennings testified that the police attempted to serve a subpoena on Williams prior to each of the three separate trial dates which had been scheduled in the case. The police principally attempted to serve Williams at the home of his mother. His mother denied that he lived there, and the neighbors indicated that although Williams did in fact live with his mother, he hid inside the house each time the police came looking for him. Sgt. Jennings also attempted to locate Williams by contacting local hospitals, jails, and utility companies. *See id.* at 85-87, 91-96. Finally, with respect to Brian Haynes, Sgt. Jennings testified that Haynes had moved from his known address and that no new address was known. He again attempted to locate Haynes by contacting local jails, hospitals, and utility companies, but was unable to find any information useful to locating Haynes. *See id.* at 87, 97.

Following this testimony, the trial court ruled that the prosecutor had used due diligence in attempting to locate Williams and Haynes. The court was concerned, however, by the fact that Smith had been driven to the courthouse but did not report to the courtroom. The court declined to rule on the prosecutor's diligence with respect to Smith at that time, instead instructing the prosecutor to again attempt to secure Smith's presence. *See id.* at 100-01. Following a two-hour recess, Sgt. Jennings informed that court that a police officer attempted, over the breach, to locate Smith at his girlfriend's home. The court then ruled that, although it was disappointed that Smith had not made it to the courtroom, the prosecutor had satisfied its due diligence obligations. *See id.* at 101. Petitioner's counsel then requested a continuance for a further opportunity to locate Smith. The court denied this request, reasoning that it was apparent from Smith's refusal to enter the court

21

2:05-cv-70580-NGE-PJK   Doc # 23   Filed 01/04/06   Pg 22 of 28   Pg ID 518

after being dropped off in front of the building that Smith was making himself unavailable. The court thus concluded that a continuance would be useless. *See id.* at 102.

Petitioner appealed the trial court's decision with respect to Smith, but not the other two witnesses. The Michigan Court of Appeals rejected petitioner's claim that the trial court had erred in finding that the prosecutor had exercised due diligence, reasoning that "by locating the witness, serving him, and transporting him to the courthouse, the police and prosecution were reasonably entitled to believe that the witness would be present at trial." *Haynes I*, 2002 WL 1424839, at *6, slip op. at 7. The court of appeals also rejected petitioner's claim that the trial court had erred in denying a continuance, for two reasons. First, the court explained that based on Smith's actions, the trial "court reasonably concluded that Smith was avoiding testifying and that a continuance would be to no avail." *Id.* at *7, slip op. at 8. Second, the court reasoned that petitioner has failed to demonstrate that he was prejudiced by the absence of Smith's testimony:

> Moreover, while defendant generally alleges on appeal that Smith's testimony would support a self-defense theory, defendant failed to make an offer of proof with regard to potential testimony and gives no reliable indication on appeal regarding the substance of Smith's testimony. Accordingly, defendant has failed to demonstrate prejudice resulting from the lack of a continuance.

*Id.*

   2.   *Analysis*

        *a. Compliance with the Res Gestae Statute*

Petitioner first claims that the prosecutor failed to exercise due diligence and that the prosecutor's striking of Smith violated the statute governing res gestae witnesses. *See* MICH. COMP. LAWS § 767.40a. Petitioner's claim is based solely on the prosecutor's alleged failure to comply with the Michigan res gestae statute. However, it is well established that errors of state law do not

22

provide a basis for habeas relief.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").  Thus, petitioner's claim that the prosecutor violated state law regarding the production of res gestae witnesses is not cognizable on habeas review.  *See Johnson v. Hofbauer*, 159 F. Supp. 2d 582, 601 (E.D. Mich. 2001) (Tarnow, J.).[2]

### b.  Denial of Continuance

Petitioner also argues that the trial court erred in denying his request for a continuance so that Smith could be located and compelled to attend the trial.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

Although the Constitution does not explicitly provide a criminal defendant with the right to "present a defense," the Sixth Amendment provides a defendant with the right to process to obtain witnesses in his favor and to confront the witnesses against him, and the Fourteenth Amendment guarantees a defendant due process of law.  Implicit in these provisions is the right to present a meaningful defense.  As the Supreme Court has recognized, "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense."  *Washington v. Texas*, 388 U.S. 14, 19 (1967).  "The right to compel a witness' presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the right to have the witness' testimony heard by the trier of fact.  The right to offer testimony is thus

---

[2]Although there is no published decision directly on point, in a number of unpublished decisions the Sixth Circuit has reached this conclusion.  *See, e.g.*, *Smith v. Elo*, No. 98-1977, 1999 WL 1045877, at *1 (6th Cir. Nov. 8, 1999) (per curiam); *Moreno v. Withrow*, No. 94-1466, 1995 WL 428407, at *1 (6th Cir. July 19, 1995) (per curiam); *Lewis v. Jabe*, No. 88-1522, 1989 WL 145895, at *3 (6th Cir. Dec. 4, 1989) (per curiam); *Atkins v. Foltz*, No. 87-1341, 1988 WL 87710, at *2 (6th Cir. Aug. 24, 1988) (per curiam).

grounded in the Sixth Amendment." *Taylor v. Illinois*, 484 U.S. 400, 409 (1988).  Further, the Court has noted that "[t]his right is a fundamental element of due process of law," *Washington*, 388 U.S. at 19, and that "[f]ew rights are more fundamental[.]" *Taylor*, 484 U.S. at 408.  Although the right to present a defense is fundamental, it is not absolute.  Thus, the right must yield to other constitutional rights, *see e.g.*, *United States v. Trejo-Zambrano*, 582 F.2d 460, 464 (9th Cir. 1978) ("The Sixth Amendment right of an accused to compulsory process to secure attendance of a witness does not include the right to compel the witness to waive his Fifth Amendment privilege."), or to other legitimate demands of the criminal justice system, *see United States v. Scheffer*, 523 U.S. 303, 308 (1998).

Although the Supreme Court has not set forth governing standards more specifically relating the circumstances in which a failure to grant a continuance will constitute a denial of the right to present a meaningful defense, the Court has noted that the grant or denial of a motion for a continuance is within the sound discretion of the trial judge, and will be reviewed only for an abuse of that discretion.  *See Avery v. Alabama*, 308 U.S. 444, 446 (1940).  The Court has also explained that "[i]t would take an extreme case to make the action of the trial court in such a case a denial of due process of law." *Franklin v. South Carolina*, 218 U.S. 161, 168 (1910).  Thus, as the Sixth Circuit has explained:

> A trial court's failure to grant a continuance to enable a defendant to exercise his constitutionally protected right to offer the testimony of witnesses and to compel their attendance may, in some circumstances, constitute a denial of due process. When a denial of a continuance forms a basis of a petition for a writ of habeas corpus, not only must there have been an abuse of discretion but it must have been so arbitrary and fundamentally unfair that it violates constitutional principles of due process. To warrant habeas relief, there must also be some showing that granting the continuance would have furthered the court's attempt to secure a just determination of the cause. We have considered the following factors in determining whether an accused was deprived of his right to due process by a denial of a motion for a

24

> continuance: the diligence of the defense in interviewing witnesses and procuring
> their presence, the probability of procuring their testimony within a reasonable time,
> the specificity with which the defense is able to describe their expected knowledge
> or testimony, the degree to which such testimony is expected to be favorable to the
> accused, and the unique or cumulative nature of the testimony.

*Mackey v. Dutton*, 217 F.3d 399, 408 (6th Cir. 2000) (internal citations, quotations, and footnotes omitted); *see also*, *Scott v. Roberts*, 975 F.2d 1473, 1475 (10th Cir. 1992).  Importantly, denial of a continuance amounts to a due process violation warranting habeas relief only where the petitioner shows that he was prejudiced by the omission of the evidence he would have procured had the continuance been granted.  *See Mackey v. Dutton*, 217 F.3d 399, 408 (6th Cir. 2000); *cf. United States v. Allen*, 247 U.S. 741, 771 (8th Cir. 2001) (applying same standard in case on direct review); *United States v. Hall*, 200 F.3d 962, 964 (6th Cir. 2000) (same).

Here, regardless of whether the trial court abused its discretion under the test set forth above, petitioner is not entitled to habeas relief because he cannot show that he was prejudiced by the omission of Smith's testimony.  First, although he states generally that Smith would have supported a claim of self-defense, petitioner does not detail what Smith's testimony actually would have been, much less has he provided any evidence, via affidavit or otherwise, as to Smith's willingness to testify and the substance of his testimony.  *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) (to state claim for relief based on Sixth Amendment right to compulsory process, the defendant "must at least make some plausible showing of how [the missing witnesses'] testimony would have been both material and favorable to his defense.").

Second, even assuming that Smith would have testified that, at the moment that petitioner shot Wright, petitioner was in reasonable fear for his life, the result of the proceeding would not have been different because self-defense would have been unavailable as a defense notwithstanding

Smith's testimony. It is well established that "one who is an initial aggressor . . . is generally not entitled to use deadly force in self-defense." *People v. Riddle*, 467 Mich. 116, 120 n.8, 649 N.W.2d 30, 35 n.8 (2002). Here, all of the evidence, including petitioner's own statement to the police, establish that although Wright may have initiated a confrontation with petitioner, petitioner left the scene, obtained a shotgun, and returned to Wright's home. Once petitioner had safely retreated from the area of danger, his actions in arming himself and voluntarily returning to the scene rendered him an initial aggressor not entitled to invoke self-defense as justification for the killing. This conclusion is a long-established and universal understanding of self-defense under the common law, and is one the Michigan courts have applied in analogous circumstances. *See People v. Kemp*, 202 Mich. App. 318, 322-23, 508 N.W.2d 184, 187 (1993) (defendant not entitled to invoke self defense where victim had called defendant at home and threatened him, victim armed himself, and voluntarily went to the victim's home, notwithstanding defendant's testimony that victim had a gun when he arrived and that he fired only after she had cocked the gun); *see also*, *People v. Martellaro*, 117 N.E.2d 1052, 1054 (Ill. 1917); *State v. McCaskill*, 142 N.W. 445, 449 (Iowa 1913); *Allen v. State*, 6 So. 242, 243 (Miss. 1889); *State v. Abdul-Khaliq*, 39 S.W.3d 880, 887 (Mo. Ct. App. 2001); *Huffman v. Commonwealth*, 39 S.E.2d 291, 293 (Va. 1946); *Sykes v. State*, 230 N.W.2d 760, 764 (Wis. 1975).

Thus, the Michigan Court of Appeals reasonably concluded that petitioner had failed to establish that he was prejudiced by the trial court's failure to grant a continuance. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.     *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an

26

unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.     NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991).  *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives_____
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

27

Dated: 1/4/06

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on January 4, 2006.

s/Eddrey Butts
Case Manager